IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PLANNED PARENTHOOD OF THE HEARTLAND, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| DAVE HEINEMAN, Governor of Nebraska, in his official capacity; | ) ) ) |
| | Case No. 4:10-cv-3122 |
| JON BRUNING, Attorney General of Nebraska; in his official capacity; | ) ) ) ) |
| KERRY WINTERER, Chief Executive Officer, and DR. JOANN SCHAEFER, Director of the Division of Public Health, Nebraska Department of Health and Human Services, in their official capacities; and | ) ) ) ) ) ) ) |
| CRYSTAL HIGGINS, President, Nebraska Board of Nursing, and BRENDA BERGMAN-EVANS, President, Nebraska Board of Advanced Practice Registered Nurses, in their official capacities; | ) ) ) ) ) |
| Defendants. | ) ) ) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR <u>PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER</u>**

Plaintiff respectfully submits this Reply Memorandum in support of its motion.

**I.    PLANNED PARENTHOOD'S CLAIMS ARE JUSTICIABLE AND PLANNED PARENTHOOD HAS STANDING TO ASSERT THEM**

Defendants devote a significant portion of their brief to arguing that Planned Parenthood's claims are not properly before this Court because no state official has adequate connection to the enforcement of the Act. Defs.' Br. in Opp'n to Pl.'s Mot. for PI and TRO ("Defs.' Opp'n Br.") at 4-8 (addressing Eleventh Amendment), 13-15 (addressing standing).

However, these arguments ignore both Defendants' authority (as clearly set forth in both the Complaint and Planned Parenthood's Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order ("Pl.'s Br." or "Opening Brief")) to revoke Planned Parenthood's facility license for a violation of the Act, as well as the professional licenses of any nurses who assist in the performance of abortions in violation of the Act, and the law of this Circuit. For these reasons, as well as the additional reasons discussed below and in Planned Parenthood's opening brief, Planned Parenthood's claims are properly before this court and Planned Parenthood has standing to assert them.

### A.     Planned Parenthood's Claims are Not Barred by the Eleventh Amendment

First, Defendants argue that Planned Parenthood's claims are barred by the Eleventh Amendment because the Ex parte Young exception to sovereign immunity does not apply unless a state officer has "some connection with the enforcement of the act." Defs.' Opp'n Br. at 5, quoting Ex parte Young, 209 U.S. 123, 157 (1908). In making this argument, Defendants rely on the Act's provision that violation does not provide grounds for criminal action, or for disciplinary action or revocation of a license to practice medicine and surgery (that is, the professional license of a doctor), Act at § 11(3), and conclude that Defendants "have no connection to enforcement of [the Act]." Defs.' Opp'n Br. at 5-6.

This argument ignores completely the authority of Defendants Kerry Winterer and Dr. Joann Schaefer, in their official capacities as Chief Executive Officer of the Department of Health and Human Services ("DHHS") and the Director of the Division of Public Health of the DHHS, respectively (together, "Defendant DHHS") to take disciplinary action (including revocation) against Planned Parenthood's health care facility license for failure to comply with the requirements of the Act. Specifically, as set forth in Planned Parenthood's Complaint at

¶¶9,16 and Opening Brief at 5, the Division of Public Health of DHHS may take disciplinary action against a facility license for, among other things:

> (1) Violation of any of the provisions of . . . the Health Care Facility Licensure Act . . . or the rules and regulations adopted and promulgated under such act[];
>
> and (2) Committing or permitting, aiding or abetting the commission of any unlawful act;

Neb. Rev. Stat. § 71-448; see also 175 Neb. Admin. Code § 7-008-01B.  The regulations promulgated under the Health Care Facility Licensure Act require, among other things, that the facility "[m]aintain[] the health clinic's compliance with all applicable statute statutes"—including the Act—as well as with "relevant rules and regulations." 175 Neb. Admin. Code § 7-006.01(2) to (3).  In addition, each facility must ensure the patient's right to "be informed in advance about care and treatment and related risks" and "[m]ake informed decisions regarding care and treatment and to receive information necessary to make those decisions." Id. § 7-006.04.  Any of these could serve as grounds for disciplinary action by DHHS, including fines, suspension, and/or revocation of its license, id. § 71-449(1), against Planned Parenthood for a violation of the so-called "informed consent" requirements imposed by the Act.

Defendants' argument also ignores completely the power and duty of Defendants DHHS, the Attorney General, and the Crystal Higgins and Brenda Bergman-Evans, in their official capacities as presidents of the Boards of Nursing and Advanced Practice Registered Nurses, respectively (together, "Defendant Boards of Nursing and Advanced Practice Registered Nurses") to revoke the licenses of Planned Parenthood nurses who assist in the performance of abortions in violation of the Act.  Specifically, as is set forth in Planned Parenthood's Complaint at ¶¶8-10, 17, and Opening Brief at 5, the Director of the Division of Public Health, in

consultation with the Board of Nursing or the Board of Advanced Practice Registered Nurses, can impose sanctions, including license suspension or revocation, against nurses for, among other things, violations of the rules and regulations relating to the particular profession; and unprofessional conduct (defined as departing from standards of acceptable and prevailing practice, and including failure to comply with any state law, rules, or regulations that pertain to the profession). Neb. Rev. Stat. §§ 38-192, 178 to 179, 196.  Each of these could provide grounds for disciplinary action against a nurse for assisting in the performance of an abortion in violation of the Act.  The Attorney General has the power and duty to file a petition in order for the Director to take such disciplinary action, id. § 38-186, and the Boards of Nursing and Advanced Practice Registered Nurses can provide "recommendations related to . . . disciplinary action." Id. § 38-161(2).

Thus, far from lacking enforcement authority under the Act, Defendants are expressly authorized to enforce it, both against Planned Parenthood's facility license (without which it cannot provide abortion services or other healthcare services) and against the professional licenses of its nursing staff.  Defendants therefore have sufficient connection with the enforcement of the Act.  See, e.g., Planned Parenthood of Cent. New Jersey v. Farmer, 220 F.3d 127, 147 (3d Cir. 2000) (holding plaintiffs had standing to sue state officials where officials had authority to impose civil penalties, including facility license revocation and fines, for violations of the challenged statute).

Finally, Defendants rely heavily on Okpalobi v. Foster, 244 F.3d 405 (5th Cir. 2001), for the proposition that the Eleventh Amendment bars constitutional challenges to an act enforceable only through tort claims by private actors.  Defs.' Opp'n Br. at 6.  First, this proposition is

4

inapplicable to the instant challenge because the Act is enforceable by Defendants (as explained above) as well as by private tort claims.

Second, to the degree that Defendants' reliance on Okpalobi is understood to suggest that the Governor's and Attorney General's broad authority to implement the laws of Nebraska do not provide an independent basis for suit against these defendants, this is not the law of the Eighth Circuit. In Citizens for Equal Protection v. Bruning, 455 F.3d 859 (8th Cir. 2006), the Eighth Circuit considered and rejected an argument that the Governor and Attorney General were protected by sovereign immunity from a challenge to a constitutional amendment that prohibited recognition of same-sex civil unions. Id. at 863-64. The Eighth Circuit began its analysis by recognizing that these defendants were not charged with any concrete role in enforcing the challenged amendment; indeed, it noted that the amendment "d[id] not require affirmative enforcement by any state official." Id. at 864. Nevertheless, the court held that the Governor's and Attorney General's "broad powers to enforce the State's Constitution *and statutes*," as set forth in article IV, section 6 of the Nebraska Constitution and section 84-731 of the Revised Statutes of Nebraska, constituted sufficient enforcement authority for suit against these defendants to fall within the Ex parte Young exception to sovereign immunity, and to give the court jurisdiction over the constitutional challenge. Id. (emphasis added). The Governor and Attorney General have the same "broad powers" to enforce Nebraska's statutes—including the Act—in the instant case, as well as to direct its enforcement by state agencies. Complaint ¶ 8. Indeed, if sovereign immunity does not apply even on the facts of Citizens for Equal Protection, where *no* defendant was charged with enforcement of the challenged provision, it clearly cannot apply here, where Defendants DHHS, the Boards of Nursing and Advanced Practice Registered Nurses, and the Attorney General all are charged with such enforcement.

And third, Okpalobi is distinguishable because it addressed sovereign immunity in the context of a statute that imposed *no* legal requirements on abortion providers; rather, it provided only that a person who provides an abortion is liable for any damages caused by the abortion. 244 F.3d at 409 n.2. Thus, there were no legal requirements at issue over which the Governor or Attorney General, or any other state official, could have any oversight or enforcement authority. Id. This is in sharp contrast to the Act at issue here, which imposes extensive obligations on Planned Parenthood and its health care providers—including that "*[n]o abortion shall be performed* except with the voluntary and informed consent of the woman," and that "[e]xcept in the case of an emergency situation, consent to an abortion is voluntary and informed *only if*," inter alia, the Act's requirements are complied with. Neb. Rev. Stat. § 28-327; Act § 4 (emphasis added).[1] For this additional reason, Defendants' reliance on Okpalobi is misplaced.

Finally, Defendants' reliance on Reproductive Health Services of Planned Parenthood of the St. Louis Region, Inc. v. Nixon, 428 F.3d 1139 (8th Cir. 2005), Defs.' Opp'n Br. at 7, is equally misplaced. In that case, the court held that potential enforcement of the challenged act by the Attorney General was not sufficient to fall within the Ex parte Young exception to sovereign immunity, because the Attorney General's ability to enforce the Act was contingent on direction by the Governor to aid prosecutors in their enforcement, or direction by a trial court to sign an indictment, and neither the Governor (who was not a party) nor the trial court had

---

[1] The same fundamental distinction applies to Nova Health Sys. v. Gandy, 416 F.3d 1149 (10th Cir. 2005), on which Defendants also rely heavily, in the related context of standing. Defs.' Opp'n Br. at 11. As in Okpalobi, the act at issue in Nova Health imposed no legal requirements on abortion providers over which state officials could have any oversight or enforcement authority. Rather, it provided only that if a person performed an abortion on a minor without parental consent or knowledge, that person would be liable for the cost of any subsequent treatment the minor received as a result of the abortion. Id. at 1153.

directed such action. 428 F.3d at 1145. Here, no Defendant's enforcement authority is contingent on any action by a non-party.

### B. Planned Parenthood Has Standing to Raise Its Claims

Defendants' challenge to Planned Parenthood's standing, like their Eleventh Amendment immunity argument, is largely premised on ignoring their clear authority to enforce the Act against Planned Parenthood, including DHHS' authority to impose significant penalties on Planned Parenthood (such as fines and suspension or revocation of its license to operate a health care facility for violations of the Act), as well as the authority of DHHS, the Attorney General, and the Boards of Nursing and Advanced Practice Registered Nurses to revoke the licenses of its nurses who assist in the performance of abortions in violation of the Act. Defendants do not dispute that such "civil and administrative penalties" would constitute irreparable harm, Defs.' Opp'n Br. at 31, much less injury in fact for purposes of standing. In addition, as explained in detail above, both the Governor and the Attorney General have broad enforcement power of the Act, including directing DHHS to enforce compliance with the Act. Thus, Planned Parenthood easily satisfies both the injury in fact and causal connection/redressability requirements for standing.

Defendants also argue that Planned Parenthood cannot raise the First Amendment free speech rights of their physicians. But Planned Parenthood's speech and their physicians' speech are one and the same—the physicians are providing services for Planned Parenthood as Planned Parenthood's employees and doing so under Planned Parenthood's name, and all written disclosures and documents required by the Act will bear Planned Parenthood's name. Thus, Planned Parenthood and its physicians are a joint mouthpiece for the disclosures; indeed, the unrefuted evidence in the case makes clear that the disclosures and efforts to comply with the

7

Act generally will stem from a collaborative process between Planned Parenthood's administrative, legal, and medical staff.  See Aff. of Penelope A. Dickey, (attached as Ex. 2 to Pls.' Am. Index of Evid. Supp. Mot. for PI and TRO ("Am. Index")) ("Dickey Aff.") ¶ 10; Aff. of Jill L. Meadows, (attached as Ex. 6 to Am. Index) ("Meadows Aff.") ¶¶ 6-7.  Nonetheless, the Court need not reach this issue; Planned Parenthood today has filed a motion to amend for leave to add Dr. Meadows, Planned Parenthood's Medical Director and one of Planned Parenthood's witnesses in this case, as a plaintiff.  See Pls. Mot. to Amend Compl.

Finally, while Defendants concede that the Supreme Court more than thirty years ago recognized that abortion providers may assert their patients' constitutional right to abortion, they argue that rule should not apply here because the Act creates a private right of action for patients against their physicians, "putting the interests of patients directly opposite of that of their physician."  Defs.' Opp'n Br. at 13 (citing Singleton v. Wulff, 428 U.S. 106, 118-118 (1976)).  This is wrong.  Since Singleton was decided, the Supreme Court has never held that abortion providers lack standing to raise the rights of their patients, including in the context of "informed consent" laws.  See, e.g., Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 881-87 (1992) (challenge by abortion providers to state informed consent statute); Thornburgh v. Am. Coll. of Obstetricians and Gynecologists, 476 U.S. 747, 759-65 (1986) (same); City of Akron v. Akron Ctr. for Reprod. Health, Inc., 462 U.S. 416, 439-49 (1983) (challenge by abortion providers to informed consent ordinance).

Moreover, courts have rejected arguments similar to those of Defendants that providers cannot raise the rights of their patients because their interests are not aligned, including in cases where the challenged statute creates a civil cause of action for patients against the provider.  See Karlin v. Foust, 188 F.3d 446, 456, 457 n.5 (7th Cir. 1999) (holding abortion providers, who

8

brought suit on their own behalf and on behalf of their patients seeking abortions, have standing in a case challenging an abortion scheme that allowed a woman to bring a civil cause of action against a physician for compensatory and punitive damages for violating the law); Am. Coll. of Obstetricians and Gynecologists v. Thornburgh, 737 F.2d 283, 289, 290 n.6 (3d Cir. 1984) (affirming "that plaintiff physicians, ACOG, and medical providers all had standing to raise their own interests (or the interests of members) and those of patients and customers" in challenging an Act regulating the provision of abortion, where the Act subjected physicians and clinics to civil tort liability for noncompliance); Rhode Island Med. Soc'y v. Whitehouse, 66 F. Supp. 2d 288, 303-04 (Dist. R.I. 1999), aff'd 239 F.3d 104, 105 & n.1 (1st Cir. 2001) (holding that physician and owners of a medical clinic had standing on behalf of themselves and their patients in a case challenging an abortion statute, where the statute created a private right of action for patients against plaintiffs); see also Karlin v. Foust, 975 F. Supp. 1177, 1202 (W.D. Wis. 1997), aff'd in part & rev'd in part on other grounds, 188 F.3d 446 (7th Cir. 1999) (holding that physicians were proper proponents of their patients' rights despite defendants' contention that physicians' financial interests were adverse to patients' interests).[2]

## II. DEFENDANTS' NARROWING CONSTRUCTION DOES NOT AVOID THE CONSTITUTIONAL IMPOSSIBILITY AND VAGUENESS PROBLEMS UNLESS MEDICAL JUDGMENT APPLIES IN DECIDING WHAT MATERIALS MUST BE SEARCHED

Defendants do not dispute that the Act's requirements impose impossible and/or vague requirements on providers, and that under a literal reading of the Act, Planned Parenthood would have to convey untruthful, misleading, and not relevant information to their patients. Instead,

---

[2] Indeed, under Defendants' logic, providers could never assert their patients' rights. In all instances, abortion providers' interests will be contrary to their patients' because patients will always have the potential to bring a civil claim against the provider if, for example, a woman believed that the abortion was not performed in accordance with the standard of care. Yet abortion providers routinely represent the interests of their patients. See cases cited supra.

Defendants argue that the Act can be narrowly construed to avoid these constitutional problems. See, e.g., Defs.' Opp'n Br. at 15 ("the Act can be construed to include meaningful limits"). Specifically, Defendants argue that the Act can be read to require that a physician include only "those risk factors and complications deemed . . . in his or her professional judgment, to be material and relevant to a particular patient." Id. at 19. Defendants further argue that the Act can be construed to "not impose any requirements on abortion providers that are contrary to the standard of care for screening for which it applies to other medical procedures." Id. at 18. "Under the traditional standard of care," Defendants explain, "informed consent is defined as 'consent to a procedure based on information which would ordinarily be provided to the patient under like circumstances by health care providers engaged in a similar practice in the locality or in similar localities.'" Id.

Planned Parenthood agrees that this narrowing construction offered by Defendants would resolve their concern that the Act requires physicians to convey untruthful, misleading and not relevant information to their patients. Planned Parenthood also agrees that this construction would resolve some of its impossibility and vagueness concerns, namely what must be included in the patient evaluation and disclosures. It is unclear, however, whether this construction is intended also to apply to the materials that must be searched on PubMed and the Thomson Reuters Master Journal List ("MJL"), which is a major component of both Planned Parenthood's impossibility and vagueness claims. As explained in Planned Parenthood's Opening Brief, the Act, read literally, imposes impossible requirements on providers because it is impossible to identify all the "risk factors" and "complications" mentioned in journals included on PubMed and the MJL. Pl.'s Br. at 13-19; Aff. of Kelly Blanchard, (attached as Ex. 5 to Am. Index) ("Blanchard Aff.") ¶¶ 12-27. To the extent there are limitations on the materials that must be

searched, the Act is impermissibly vague because it is wholly unclear what those limitations are, including whether there are any date, language, type, or quality restrictions on the articles or journals that must be searched. In addition, is it permissible to search only articles that can reasonably be accessed and retrieved, such as those that can be both searched and retrieved electronically? Pl.'s Br. at 22; Dickey Aff. ¶ 12; Meadows Aff. ¶ 10.

Absent the ability to exercise professional judgment in line with accepted medical practices about what materials must be searched and reviewed, the Act is still impossible to comply with and/or void for vagueness. With respect to impossibility, Defendants argue that there are limits on the articles that must be reviewed—the claimed "association" must be statistically validated, and must be published in a journal that is "peer reviewed" and "indexed" by PubMed or MEDLINE or included in the MJL at least twelve months before the pre-abortion evaluation. Defs.' Opp'n Br. at 21. But none of these limitations cure or even temper the impossibility problems identified by Planned Parenthood. Planned Parenthood has demonstrated—and Defendants have utterly failed to refute—that there is a boundless volume of articles published in journals included on PubMed and the MJL; that not all of the articles from those journals can be searched electronically; that even those articles that are electronically searchable are only partially searchable, which means providers could never be sure they have captured all potentially responsive articles; that it is impossible to craft a comprehensive search that efficiently retrieves responsive articles; and that there are many additional limitations, including that many of the articles are in any of forty different foreign languages, and it would be exorbitantly expensive to retrieve articles that may be responsive. Pl.'s Br. at 13-19; Blanchard Aff. ¶¶ 13-27. Indeed, Planned Parenthood cannot even determine whether an article meets the

11

"statistically validated" requirement without first being able to find, retrieve, and review that article—three things Planned Parenthood has shown are not possible.

Defendants further argue that there are only about twelve studies a year that would need to be considered under the Act—essentially, those that were considered by the American Psychological Association ("APA") in their 2008 report on abortion and mental health. Defs.' Opp'n Br. at 21. Unless this number is intended to suggest a limiting construction that Planned Parenthood need only consider the articles discussed in the APA report or the reports of similar reputable, mainstream professional organizations, it is a misstatement of the Act's requirements. First, the number is based only on articles related to abortion and mental health that the APA considered in drafting its report. There is no indication that the APA conducted the type of scorched-earth search that the Act, read literally, requires—indeed, it is clear from the report that the APA imposed certain limitations on the articles they considered, including reviewing only English-language articles and only articles that came up in response to specified search terms. Brenda Major et al., Report of the APA Task Force on Mental Health and Abortion 21 (2008), available at http://www.apa.org/pi/women/programs/abortion/mental-health.pdf). Moreover, the "risk factors" and "complications" covered by the Act are not limited to mental health.

Finally, and even more fundamentally, any discussion of the number of articles that contain responsive materials is a red herring. The issue is not how many studies at the end of the day a provider would have to consider, but how does the provider find, retrieve, and review all the thousands of potentially responsive articles to pick out the 12, 20, or 200, that contain information covered by the Act and that the physician must consider including in the patient evaluation and disclosure?

As regards vagueness, Defendants argue that the limiting construction they propose resolves Planned Parenthood's concerns. Defs.' Opp'n Br. at 23. However, this is true only if Defendants' proposed limiting construction is understood to extend professional judgment to the question of what materials must be searched and reviewed. Absent such a construction, it is completely unclear what it means to have the ability to exercise professional judgment as to what risk factors to evaluate for and what complications must be disclosed because they are relevant and material to the patient. Id. at 19. For example, if Planned Parenthood does not disclose irrelevant or immaterial information from a study it has never seen because the article is not electronically searchable (despite being included in PubMed or the MJL and thus potentially triggering obligations under the Act), can Planned Parenthood be deemed to have exercised medical judgment with regard to that article despite never having read it?

Defendants further contend that the "affirmative defense" and "scienter" requirement in the Act "provide a defense to any vagueness concerns." Id. at 23-24. This argument is without merit for a number of reasons. Both the affirmative defense and scienter requirement only go to private civil actions brought pursuant to the Act—they do not apply in the context of arbitrary and discriminatory enforcement by DHHS and the Boards of Nursing and Advanced Practice Registered Nurses for violations of the Act. Further, they are limited even as pertains to private civil actions. The so-called "affirmative defense" requires "statistically validated surveys of the general population of women of reproductive age, conducted within three years [of] the contested abortion," Act at § 10(5). This is wholly ridiculous because, among other reasons, for any civil actions brought more than three years after the abortion, the physician would need to have conducted a survey based on a guess of what a plaintiff somewhere down the road would allege should have been disclosed. In addition, the "affirmative defense" would only rebut an

13

allegation of inadequate disclosure; it resolves none of the Act's vagueness, including what boundaries, if any, exist on the materials that must be searched.

Moreover, the scienter requirement of an "intentional, knowing, or negligent" failure is also limited even as pertains to private civil actions; it appears only to apply to the "award of reasonable costs and attorney's fees" and a wrongful death action, Act at § 6(1), (2), and not to an action for professional negligence. In any event, the U.S. Supreme Court has made clear that a scienter provision is not a cure-all for vagueness. In Smith v. Goguen, 377 U.S. 360 (1964), for example, the Court held that reading "knowledge . . . into every provision" did not make clear "what is it that the [plaintiff] must 'know'" and, therefore, did not cure the vagueness of a statute that prohibited "subversive" individuals from certain employment. 377 U.S. at 369. In addition, courts have routinely struck down laws regulating abortion on vagueness grounds, even in the presence of a scienter requirement. See Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 933 (9th Cir. 2004) ("A scienter requirement of knowledge as applied to an unknowable element cannot save a provision from constitutional invalidity."); Richmond Med. Ctr. for Women v. Gilmore, 55 F. Supp. 2d 441, 499 (E.D. Va. 1999) ("All three [scienter requirements] modify otherwise vague terms in the Act, and they do not render the Act's vague language any more certain. Thus the scienter requirements fail to provide physicians subject to the Act's criminal penalties with any more notice of what is forbidden."). Cf. Planned Parenthood Ass'n of Kansas City, Missouri, Inc. v. Ashcroft, 655 F. 2d 848, 860 (8th Cir. 1981) ("[T]he presence of a scienter requirement will not entirely eliminate problems caused by vagueness."), rev'd in part on other grounds, 462 U.S. 476 (1983).

The scienter provisions here similarly do no resolve the Act's vagueness. Absent a narrowing construction that permits the use of medical judgment in determining what materials

14

must be searched (and not just for what risk factors and complications must be included in patient evaluation and disclosure), an "intentional, knowing, or negligent" requirement does not clarify how far physicians must go to comply with the Act. For example, if a provider knows there are articles more than forty years old on PubMed and intentionally does not search those articles because, in his or her medical judgment, they would not be relevant, can that provider be in violation of the Act?

### III.   THE ACT'S APPLICATION TO OUT-OF-STATE PROVIDERS

Defendants concede that section 10(4) of the Act "unconstitutionally extends the reach of the Act to conduct that occurs outside of Nebraska." Defs.' Opp'n Br. at 25-26; see also Pl.'s Br. at 34-37. While Planned Parenthood does not concede the constitutionality of the remainder of the Act, Planned Parenthood does not contest Defendants' argument that section 10(4) is severable. See Defs.' Opp'n Br. at 25-26.

### IV.   PLANNED PARENTHOOD'S REMAINING CLAIMS HAVE NOT BEEN ABANDONED.

Finally, Defendants suggest that Plaintiff has somehow abandoned those claims not discussed in its opening brief, and cite as authority Rule 39.2(c) of the Civil Rules of the United States District Court for the District of Nebraska, which provides simply that "a judge may treat a party's failure to file a brief or discuss an issue in a brief as an abandonment of that party's position on any issue not briefed or discussed." Defs.' Opp'n Br. at 27. Plaintiff has not abandoned these claims. Rather, they are not part of the basis on which it seeks a preliminary injunction or temporary restraining order. As the only briefs Plaintiff has filed are those in support of its Motion for Preliminary Injunction and Temporary Restraining Order, failure to discuss these claims in those briefs cannot be deemed to constitute abandonment.

## V. ABSENT A NARROWING CONSTRUCTION THAT THE ACT'S REQUIREMENTS PERMIT MEDICAL JUDGMENT, PLANNED PARENTHOOD WILL SUFFER IRREPARABLE HARM

Unless Defendants' construction that the physician can exercise his or her professional judgment according to accepted medical practices is applied to the materials that must be searched under the Act, and not only to the "risk factors" and "complications" that must be identified and disclosed, Planned Parenthood will suffer irreparable harm. As explained in detail in Planned Parenthood's Opening Brief, the only way for Planned Parenthood to be sure it is complying with the impossible, or unknowable, requirements of the Act is to cease providing abortion services. Defendants do not dispute that the deprivation of a woman's constitutional right to choose to terminate a pregnancy is irreparable harm. Defs.' Opp'n Br. at 30.

If Planned Parenthood undertakes reasonable efforts to comply with the Act, it will be at constant risk of significant penalties, including civil and administrative penalties. Defendants concede that such civil and administrative penalties "can constitute irreparable harm," but argue that the Act creates no exposure to such harm and only permits private civil actions. Id. at 31. As explained in detail above, this is wrong and completely ignores the fact that DHHS has both the power and duty to take disciplinary action against Planned Parenthood's health care facility license—including imposing fines, or license suspension or revocation—for failure to comply with the Act. DHHS, together with the Attorney General and the Boards of Nursing and Advanced Practice Registered Nurses can take action against Planned Parenthood's nurses for participating in the performance of abortions where the so-called "informed consent" requirements of the Act have not been met.

Further, Defendants themselves concede that a saving or narrowing construction is necessary to avoid the constitutional problems. Absent such a construction that would apply not

only to the evaluation and disclosure obligations, but also to the materials that would have be searched, the Act would continue to violate patients' and practitioners' rights because it would effectively ban abortion by imposing impossible requirements, or violate the due process clause because it is vague as to what boundaries exist on the materials that must be searched.

Finally, Defendants argue that Planned Parenthood's claim of financial harm is "abstract." As Planned Parenthood has fully explained, it would exorbitantly expensive to comply with Act's requirements. Pl.'s Br. at 19, 37, 39.

Defendants have also utterly failed to demonstrate that the balance of harm or public interest favors allowing the law to go into effect. Defendants rely on the testimony of a single woman, who had her abortion more than twenty years ago, Judiciary Comm. Hr'g, L.B. 594, 101st Leg., 1st Sess. 67 (Mar. 5, 2009) (statement of Justine Kyker), at a non-Planned Parenthood clinic, Judiciary Comm. Hr'g, L.B. 594, 101st Leg., 1st Sess. 67 (Mar. 5, 2009) (statement of Bobbie Kierstad, Vice President, Planned Parenthood of Nebraska and Council Bluffs), to speculate that enjoining the law will result in "countless women suffering from a lifetime of physical, psychological, and emotional damages based on a decision to have an abortion, without explanation as to any risks and complications associated with the abortion. . . ." Defs.' Opp'n Br. at 28. But, under existing common law and statutory law requirements, providers are already required to disclose the risks and complications associated with abortion (and the unrefuted evidence in this case demonstrates that Planned Parenthood complies with all existing informed consent requirements, see Dickey Aff. ¶ 7), and there has been no showing that such laws have failed to adequately protect the interests of women seeking abortions in Nebraska. To the contrary, the legislative testimony reveals that abortions are extremely safe and that the existing laws protect the health and interests of women. See, e.g., Judiciary Comm.

17

Hr'g, L.B. 594, 101st Leg., 1st Sess. 74 (Mar. 5, 2009) (statement of Sara Juster, representative of Nebraska Methodist Health System, Hospital, and Physician's Clinic) (testifying that under existing law, women are already receiving good informed consent); Floor Debate, L.B. 594, 101st Leg., 2nd Sess. 23-24 (Apr. 7, 2010) (statement of Sen. Danielle Conrad) (testifying that there is no showing in record of a problem to be fixed or of women getting inadequate informed consent and that current law is one of the strongest in the nation).

## CONCLUSION

For the foregoing reasons and those set forth in Plaintiff's Opening Brief, the Court should grant Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order.

Dated: July 12, 2010

BY: PLANNED PARENTHOOD OF THE HEARTLAND

BY: ____/s/ Andrea D. Snowden_____
W. Scott Davis, # 10938
Andrea D. Snowden, # 21784
Baylor, Evnen, Curtiss, Grimit & Witt, LLP
Wells Fargo Center
1248 O Street, Suite 600
Lincoln, Nebraska 68508-1499
Telephone: (402) 475-1075
Fax: (402) 475-9515
E-mail: wdavis@baylorevnen.com
asnowden@baylorevnen.com

Mimi Liu
Planned Parenthood Federation of America
1110 Vermont Ave, NW
Suite 300
Washington, District of Columbia 20005
Telephone: (202) 973-4862
Fax: (202) 296-3480
E-mail: mimi.liu@ppfa.org

        Jennifer Sandman
        Roger Evans*
        Planned Parenthood Federation of America
        434 West 33rd Street
        New York, New York 10001
        Telephone: (212) 261-4584
        Fax: (212) 247-6811
        E-mail: jennifer.sandman@ppfa.org
              roger.evans@ppfa.org

        ATTORNEYS FOR PLAINTIFFS

        Alexa Kolbi-Molinas
        American Civil Liberties Union
        125 Broad Street, 18th Floor
        New York, New York 10004
        Telephone: (212) 549-2633
        Fax: (212) 549-2652
        E-mail: akolbi-molinas@aclu.org

        OF COUNSEL FOR PLAINTIFF

        *Application for admission *pro hac vice*
        pending

## CERTIFICATE OF SERVICE

I, Andrea D. Snowden, am one of the attorneys of record for Plaintiff and hereby certify that on the 12th day of July, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Katherine J. Spohn
Kevin L. Griess
Attorney General's Office
2115 State Capitol
Lincoln, NE  68509

Lawrence J. Joseph
1250 Connecticut Avenue NW Suite 200
Washington, D.C.  20036

        BY:    __/s/  Andrea D. Snowden_____
                   Andrea D. Snowden,# 21784