**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF THE HEARTLAND and | ) ) ) | CASE NO. 4:10CV3122 |
| DR. JILL L. MEADOWS, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| DAVE HEINEMAN, Governor of Nebraska, in his official capacity; | ) ) ) | MEMORANDUM AND ORDER |
| JON BRUNING, Attorney General of Nebraska; in his official capacity; | ) ) ) | |
| KERRY WINTERER, Chief Executive Officer, and DR. JOANN SCHAEFER, Director of the Division of Public Health, Nebraska Department of Health and Services, in their official capacities; and | ) ) ) ) ) ) | |
| CRYSTAL HIGGINS, President, Nebraska Board of Nursing, and BRENDA BERGMAN-EVANS, President, Nebraska Board of Advanced Practice Registered Nurses, in their official capacities, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court on the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Filing No. 2).[1]  The Motion is supported by a brief and indexes of evidence (Filing Nos. 4, 3, and 31).   Defendants entered a Notice of Appearance (Filing No. 21), and the Court conferred with counsel for the parties on June 29, 2010, for purposes of establishing a briefing schedule.  In accordance with the agreed-

---

[1] On July 12, 2010, Planned Parenthood moved to amend its Complaint to add as a party plaintiff Dr. Jill L. Meadows, M.D.  The Court granted the motion, and the Amended Complaint appears at Filing No. 51.

upon schedule, Defendants submitted their Brief (Filing No. 39) and Index of Evidence (Filing No. 40), and Plaintiffs submitted a Reply Brief (Filing No. 49).  Defendants objected (Filing No. 37) to Plaintiffs' Index of Evidence, and Plaintiffs responded to the objections (Filing No. 50).   Although the Defendants' evidentiary objections will be denied for purposes of the Court's analysis of the pending Motion, the Court has considered the objections when determining what weight to give to the Plaintiffs' evidence.  Oral argument was heard on July 13, 2010.  For the reasons discussed below, the Motion will be granted in part and denied in part.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Planned Parenthood of the Heartland ("Planned Parenthood") is a not-for-profit corporation doing business in Nebraska.  (Amended Compl., Filing No. 51, ¶ 7.)  It operates a health center in Lincoln, Nebraska, licensed by the Nebraska Department of Health and Human Services ("DHHS").  The center "provides a broad range of reproductive health services, including, but not limited to, physical exams; pregnancy testing and planning services; contraception and contraceptive education; HIV testing; testing and treatment for sexually transmitted infections; screening for breast, cervical, colon, prostate and testicular cancer; and abortion."  (*Id*.)  Planned Parenthood intends to open a similar center in Omaha this year, and it provides similar services in Iowa and advertises those services in Nebraska.  (*Id*.)  Planned Parenthood employs registered nurses and nurse practitioners, licensed by DHHS, to assist the physician with abortion procedures.  (*Id.*)  Planned Parenthood brought this action "on its own behalf and on behalf of its current and future physicians, nurses, employees, staff, servants, officers and agents who participate in abortions, and on behalf of its current and future patients seeking abortion services."  (*Id*.)

Plaintiff Dr. Jill Meadows is a practicing obstetrician and gynecologist, and Planned Parenthood's Medical Director.  (*Id.* ¶ 8).  She is licensed to practice medicine in Nebraska, and, in addition to her duties of ensuring that all Planned Parenthood's medical services comply with applicable legal and professional obligations, she provides medical services, including some abortion services, in Nebraska.  (*Id.*)  She brought the action on her own behalf and on behalf of her current and future patients seeking abortion services.  (*Id.*)

Defendant Dave Heineman is the Governor of Nebraska.  Defendant Jon Bruning is the Attorney General of Nebraska.  Both have broad powers to enforce and defend Nebraska statutes.  Defendant Kerry Winterer is the Chief Executive Officer of DHHS. Defendant Dr. Joann Schaefer is the Director of the Division of Public Health, one of six divisions within DHHS, and its Chief Medical Officer.  Dr. Schaefer has the power and duty to take disciplinary action against health care facilities, registered nurses, and nurse practitioners.  Defendants Crystal Higgins and Brenda Bergman-Evans are the Presidents of the Nebraska Board of Nursing and Board of Advanced Practice Registered Nurses, respectively, which provide recommendations related to the issuance or denial of nursing credentials, and discipline of nurses.  All Defendants have been sued in their official capacities only.  (*Id.* ¶¶ 9-11.)

On April 13, 2010, Governor Heineman approved a Legislative Bill passed by the Nebraska Legislature, "LB 594," that will become effective July 15, 2010.  (*Id*. ¶¶ 1, 2, 9, and Exhibit 1, Filing No. 1-1.)  The bill contains eighteen sections.  It amends nine existing Nebraska statutes related to abortion; creates seven new statutes related to abortion; provides for severability of the bill's sections, and parts of its  sections, in the event that any section or part of a section is declared invalid or unconstitutional; and repeals the nine original statutes that the bill amended.

3

Plaintiffs brought this action pursuant to 42 U.S.C. § 1983, challenging LB 594 on seven constitutional bases.  First, they contend that the bill is an effective ban on abortion in violation of their present and future patients' Fourteenth Amendment rights of liberty and privacy.  Second, they allege that the bill is impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment.  Third, they allege that the bill compels the disclosure of untruthful, misleading, irrelevant and unreasonable information to patients, in violation of the First Amendment rights of medical professionals, and resulting in an undue burden on the exercise of patients' Fourteenth Amendment rights.  Fourth, they allege that the bill violates the Commerce Clause and Due Process Clause by purporting to subject out-of-state providers to the bill's mandates.  Fifth, they allege that the bill violates medical providers' and patients' rights of Equal Protection under the Fourteenth Amendment, because the bill treats informed consent for abortion differently than informed consent for any other medical service or procedure.  Sixth, they allege that the bill violates patients' rights of liberty and privacy under the Fourteenth Amendment by requiring them to disclose personal information not medically relevant to the abortion procedure as a condition to obtaining an abortion.  Seventh, they allege that the bill violates minors' rights of liberty and privacy under the Fourteenth Amendment by requiring them to disclose, including to a parent, personal information not medically relevant to the abortion procedure.

Plaintiffs moved for a Temporary Restraining Order and Preliminary Injunction to prevent the bill from taking effect on July 15, 2010, and they also seek a judgment declaring that the bill is unconstitutional and that the Defendants are permanently enjoined from enforcing it.  At the time of oral argument, Plaintiffs acknowledged that they are not asking the Court to enjoin the effective date of the bill or the bill itself, but to enjoin the Defendants from enforcing its terms.

## STATUTORY FRAMEWORK

### I.  LEGISLATIVE BILL 594

LB 594 amends nine statutes, and creates seven new statutes, all within the Nebraska Criminal Code, and all related to abortion.  Five of the bill's sections that amend existing statutes do not contain substantive amendments, but simply conform or harmonize statutory language to allow appropriate cross-reference to other statutes.  Accordingly, sections 1, 13, 14, 15,  and 16 of the bill will not be discussed.  Section 17 provides for severability of the bill's sections, and parts of its sections, in the event that any section or part of a section is declared invalid or unconstitutional.  Section 18 repeals original statutes amended by the bill.   It is Sections 2 through 12 that contain language that will be addressed by the Court for purposes of the pending Motion for Temporary Restraining Order.

Section 2 of the bill would amend Neb. Rev. Stat. § 28-325, a statute that expresses the Nebraska Legislature's opinion, intent, and motivation, and includes other precatory language, but does not impose any specific legal duties, obligations, or penalties.  This statute declares the Legislature's view that *Roe v. Wade*, 410 U.S. 113 (1973), was a "legislative intrusion of the United States Supreme Court" that "removed the protection afforded the unborn" and that members of the Legislature "expressly deplore the destruction of the unborn human lives which has and will occur in Nebraska as a consequence of [*Roe*]," and intend "to provide protection for the life of the unborn child whenever possible."  LB 594 would add to this section, *inter alia*, an expression of the Legislature's opinion that "the existing standard of care for preabortion screening and counseling is not always adequate to protect the health needs of women," and "[t]hat clarifying the minimum standard of care for preabortion screening and counseling in statute is a practical means of protecting the well-being of women[.]" Nothing in the amendments

to § 28-325 imposes any duty, obligation, or penalty, or directly restricts access to products or services related to abortion.

Section 3 of the bill would amend Neb. Rev. Stat. § 28-326, a statute that contains definitions related to the topic of abortion.  LB 594 would add three new definitions.

> (2) Complications associated with abortion means any adverse physical, psychological, or emotional reaction that is reported in a peer-reviewed journal to be statistically associated with abortion such that there is less than a five percent probability (P < .05) that the result is due to chance.
> . . . .
>
> (11)  Risk factor associated with abortion means any factor, including any physical, psychological, emotional, demographic, or situational factor, for which there is a statistical association with one or more complications associated with abortion such that there is less than a five percent probability (P < .05) that such statistical association is due to chance.  Such information on risk factors shall have been published in any peer-reviewed journals indexed by the United States National Library of Medicine's search services (PubMed or MEDLINE) or in any journal included in the Thomson Reuters Scientific Master Journal List not less than twelve months prior to the day preabortion screening was provided[.]
>
> (12)  Self-induced abortion means any abortion or menstrual extraction attempted or completed by a pregnant woman on her own body[.]

Although this section merely provides definitions, it may impose new duties, obligations, or penalties, because other pre-LB 594 statutes use terms similar to one or more of the newly defined terms, such as "medical risks associated with the particular abortion procedure," contained in Neb. Rev. Stat. § 28-327(1).

Section 4 of the bill would amend Neb. Rev. Stat. § 28-327, a statute that prohibits abortions "except with the voluntary and informed consent of the woman[.]" As § 28-327 appears before amendment by LB 594, it contains five sub-sections and fifteen sub-sub-sections, setting out at least 36 discrete requirements for voluntary, informed consent to an abortion.  Section 4 of the bill would add to these requirements:

6

(4) At least one hour prior to the performance of an abortion, a physician, psychiatrist, psychologist, mental health practitioner, physician assistant, registered nurse, or social worker licensed under the Uniform Credentialing Act has:

(a) Evaluated the pregnant woman to identify if the pregnant woman had the perception of feeling pressured or coerced into seeking or consenting to an abortion;

(b) Evaluated the pregnant woman to identify the presence of any risk factors associated with abortion;

(c) Informed the pregnant woman and the physician who is to perform the abortion of the results of the evaluation in writing.  The written evaluation shall include, at a minimum, a checklist identifying both the positive and negative results of the evaluation for each risk factor associated with abortion and both the licensed person's written certification and the woman's written certification that the pregnant woman was informed of the risk factors associated with abortion as discussed; and

(d) Retained a copy of the written evaluation results in the pregnant woman's permanent record;

(5) If any risk factors associated with abortion were identified, the pregnant woman was informed of the following in such manner and detail that a reasonable person would consider material to a decision of undergoing an elective medical procedure;

(a) Each complication associated with each identified risk factor; and

(b) Any quantifiable risk rates whenever such relevant data exists [sic];

(6) The physician performing the abortion has formed a reasonable medical judgment, documented in the permanent record, that:

(a) The preponderance of statistically validated medical studies demonstrates that the physical, psychological, and familial risks associated with abortion for patients with risk factors similar to the patient's risk factors are negligible risks;

(b) Continuance of the pregnancy would involve risk of injury to the physical or mental health of the pregnant woman greater than if the pregnancy were terminated by induced abortion; or

(c) Continuance of the pregnancy would involve less risk of injury to the physical or mental health of the pregnant woman than if the pregnancy were terminated by an induced abortion[.]

Section 5 of the bill would provide: "Any waiver of the evaluations and notices

provided for in subdivision (4) of section 28-327 is void and unenforceable."

Section 6 of the bill would provide:

In addition to whatever remedies are available under the common or statutory laws of this state, the intentional, knowing, or negligent failure to

7

comply with the requirement of section 28-327 shall provide a basis for the following damages:

(1) The award of reasonable costs and attorney's fees; and

(2) A recovery for the pregnant woman for the wrongful death of her unborn child under section 30-809 upon proving by a preponderance of evidence that the physician knew or should have known that the pregnant woman's consent was either not fully informed or not fully voluntary pursuant to section 28-327.

Section 7 of the bill would provide that actions may be brought based on alleged failures to comply with the requirements of § 28-327, within the time periods allowed for actions based on malpractice and professional negligence in Neb. Rev. Stat. §§ 25-222 and 44-2828 (providing two-year statutes of limitations for malpractice or professional negligence, but allowing a period of repose up to ten years when a cause of action could not reasonably be discovered within two years).

Section 8 of the bill would provide: "If a physician performed an abortion on a pregnant woman who is a minor without providing the information required in section 28-327 to the pregnant woman's parent or legal guardian, then the physician bears the burden of proving that the pregnant woman was capable of independently evaluating the information given to her."

Section 9 of the bill would provide: "Except in the case of an emergency situation, if a pregnant woman is provided with the information required by section 28-327 less than twenty-four hours before her scheduled abortion, the physician shall bear the burden of proving that the pregnant woman had sufficient reflection time, given her age, maturity, emotional state, and mental capacity, to comprehend and consider such information."

Section 10 of the bill would provide:

(1) In determining the liability of the physician and the validity of the consent of a pregnant woman, the failure to comply with the requirements of section 28-327 shall create a rebuttable presumption that the pregnant woman would not have undergone the recommended abortion had section 28-327 been complied with by the physician;

8

(2) The absence of physical injury shall not preclude an award of noneconomic damages including paid, suffering, inconvenience, mental suffering, emotional distress, psychological trauma, loss of society or companionship, loss of consortium, injury to reputation, or humiliation associated with the abortion;

(3) The fact that a physician does not perform elective abortions or has not performed elective abortions in the past shall not automatically disqualify such physician from being an expert witness.  A licensed obstetrician or family practitioner who regularly assists pregnant women in resolving medical matters related to pregnancy may be qualified to testify as an expert on the screening, counseling, management, and treatment of pregnancies;

(4) Any physician advertising services in this state shall be deemed to be transaction business in this state pursuant to section 25-536 and shall be subject to the provisions of section 28-327;

(5) It shall be an affirmative defense to an allegation of inadequate disclosure under the requirements of section 28-327 that the defendant omitted the contested information because statistically validated surveys of the general population of women of reproductive age, conducted within the three years before or after the contested abortion, demonstrate that less than five percent of women would consider the contested information to be relevant to an abortion decision; and

(6) In addition to the other remedies available under the common or statutory law of this state, a woman or her survivors shall have a cause of action for reckless endangerment against any person, other than a physician or pharmacist licensed under the Uniform Credentialing Act, who attempts or completes an abortion on the pregnant woman or aids or abets the commission of a self-induced abortion.  Proof of injury shall not be required to recover an award, including reasonable costs and attorney's fees, for wrongful death under this subdivision.

Section 11 of the bill would provide:

(1) In the event that any portion of section 28-327 is enjoined and subsequently upheld, the statute of limitations for filing a civil suit under section 28-327 shall be tolled during the period for which the injunction is pending and for two years thereafter.

(2) Nothing in section 28-327 shall be construed as defining a standard of care for any medical procedure other than an induced abortion.

(3) A violation of subdivision (4), (5), or (6) of section 28-327 shall not provide grounds for any criminal action or disciplinary action against or revocation of a license to practice medicine and surgery pursuant to the Uniform Credentialing Act.

9

Section 12 of the bill would amend Neb. Rev. Stat. § 28-327.01 to require DHHS to make available on its website certain materials regarding services available to women.

## II.  PURPOSE OF THE CRIMINAL CODE

Neb. Rev. Stat. § 28-101 provides: "Sections 28-101 to 28-1350 shall be known and may be cited as the Nebraska Criminal Code."  Neb. Rev. Stat. 28-102 provides:

The general purposes of the provisions governing the definition of offenses are:
(1) To forbid and prevent conduct that unjustifiably and inexcusably inflicts or threatens substantial harm to individual or public interests;
(2) To subject to public control persons whose conduct indicates that they are disposed to commit crimes;
(3) To safeguard conduct that is without fault and which is essentially victimless in its effect from condemnation as criminal;
(4) To give fair warning of the nature of the conduct declared to constitute an offense; and
(5) To differentiate on reasonable grounds between serious and minor offenses.

## III.  LAWS GOVERNING HEALTH CARE FACILITIES

Planned Parenthood operates a "health care facility" as defined in Neb. Rev. Stat. § 71-413.  ("Health care facility means an ambulatory surgical center, . . . a health clinic, a hospital, an intermediate care facility, . . . [or] a public health clinic[.]")

Neb. Rev. Stat. § 71-432 provides, in relevant part:

A health care facility or health care service shall not be established, operated, or maintained in this state without first obtaining a license issued by the department [DHHS] under the Health Care Facility Licensure Act.  No facility or service shall hold itself out as a health care facility or health care service or as providing health care services unless licensed under the act.

Neb. Rev. Stat. § 71-448 sets out grounds for the Division of Public Health of DHHS to take disciplinary action against a license issued under the Health Care Facility Licensure Act.  Such grounds include: "Committing or permitted, aiding, or abetting the commission of any unlawful act."  Neb. Rev. Stat. § 71-449 sets out the discipline that DHHS may

10

impose against the license of a health care facility for such a violation, including any combination of the following:

> (a) A fine not to exceed ten thousand dollars per violation;
> (b) A prohibition on admissions or readmissions, a limitation on enrollment, or a prohibition or limitation on the provision of care or treatment;
> (c) A period of probation not to exceed two years during which the facility or service may continue to operate under terms and conditions fixed by the order of probation;
> (d) A period of suspension not to exceed three years during which the facility or service may not operate; and
> (e) Revocation which is a permanent termination of the license and the licensee may not apply for a license for a minimum of two years after the effective date of the revocation.

Neb. Rev. Stat. § 71-450 provides that DHHS "shall consider," in determining what type of disciplinary action to impose, "the extent to which the provisions of applicable statutes were violated."

## IV.  LAWS GOVERNING NURSES AND NURSE PRACTITIONERS

Nebraska's Uniform Credentialing Act is found at Neb. Rev. Stat. §§ 38-101 to 38-1,140.  It prohibits individuals from engaging in nursing or advanced practice nursing, unless they hold the proper credential from DHHS.  (Neb. Rev. Stat. § 38-121.)  The Act creates the Boards of Nursing and Advanced Practice Registered Nurses (Neb. Rev. Stat. § 38-167), that "[r]ecommend disciplinary action relating to licenses" of nurses and advanced practice registered nurses (Neb. Rev. Stat. § 38-206).  Discipline is imposed by the Director of DHHS, following the filing of a petition, prosecuted by the Nebraska Attorney General.  (Neb. Rev. Stat. §§ 38-176, 38-186).  Grounds for discipline include "[f]ailure to comply with any . . . state . . . law . . . that pertains to the applicable profession[.]" (Neb. Rev. Stat. § 38-179(13).)  Discipline may include the suspension or revocation of a professional credential, and civil penalties not to exceed $20,000.  (Neb. Rev. Stat. § 38-196, 38-198.)

11

The Act also contains a reporting requirement, mandating that every credential holder report to DHHS when he or she has first-hand knowledge of facts giving him or her reason to believe that any person in his or her profession has engaged in unprofessional conduct as defined in § 38-179.  (Neb. Rev. Stat. §38-1,125(1)(a)(iii). Violations of the terms of the Uniform Credentialing Act give rise to criminal prosecution, and may result in convictions of Class II and III misdemeanors.  (Neb. Rev. Stat. § 38-1,118.)  The Attorney General must prosecute such civil or criminal actions, at the request of DHHS.  (Neb. Rev. Stat. § 38-1,139.)

## STANDARD OF REVIEW

In determining whether a preliminary injunction should issue, the Court is required to consider the factors set forth in *Dataphase Systems, Inc. v. C.L. Sys. Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (*en banc*).  A district court should weigh "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id.*  A preliminary injunction is considered an extraordinary remedy, and the burden of proving each of the *Dataphase* factors lies with the party seeking the  injunction. *Watkins v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  The Court weighs the same factors to determine whether a temporary restraining order should issue.  *Baker Elec. Co-Op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994).

"[W]here a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute . . . district courts [must] make a threshold finding that a party is likely to prevail on the merits."  *Planned Parenthood of Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (*en banc*).  This standard is more rigorous than "the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to

12

enjoin something other than government action based on presumptively reasoned democratic processes." *Id*. at 732. The threshold determination of likelihood of success ensures that "preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis." *Id.* at 733. "If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other *Dataphase* factors." *Id.* at 732.

It is recognized that "if a law is susceptible of a reasonable interpretation which supports its constitutionality, the court must accord the law that meaning." *Jones v. Gale*, 470 F.3d 1261, 1268 (8th Cir. 2006) (quoting *Planned Parenthood of Minn. v. State of Minn*., 910 F.2d 479, 482 (8th Cir. 1990)); *see also Frisby v. Schultz*, 487 U.S. 474, 483 (1988) ("To the extent they endorsed a broad reading of the ordinance, the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties."). Accordingly, this Court begins its analysis by considering Planned Parenthood's likelihood of success on the merits of its challenge to LB 594, recognizing that "an appropriately deferential analysis" must be employed when the constitutionality of a state statute is challenged.

## DISCUSSION

## I.  ARTICLE III CASE OR CONTROVERSY

Defendants argue that LB 594 creates only private, civil remedies, and so Plaintiffs have no standing to challenge the constitutionality of the bill in this forum. Defendants' arguments are well-presented and merit thorough discussion.[2]

---

[2] Assistant Attorney General Katherine Spohn's Brief submitted on behalf of the Defendants was thorough and well-reasoned, despite being prepared on relatively short notice. The very capable representation of the Defendants by the Office of the Nebraska Attorney General obviates the need for the Court to consider amici briefs.

## A.  Plaintiffs' Standing to Obtain Injunctive Relief

Article III of the United States Constitution limits the judicial power of the federal courts to "cases" and "controversies."   U.S. Const. art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992).   Cases and controversies are limited to claims alleging some injury in fact that is redressable by a favorable judgment.  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004).  Standing is "[o]ne of the controlling elements in the definition of a case or controversy under Article III."   *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 598 (2007) (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (Kennedy, J., concurring)).   Under Article III, the judicial power granted to federal courts "is not an unconditioned authority to determine the constitutionality of legislative or executive acts."   *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982).   "At a constitutional minimum, standing requires three elements: (1) injury-in-fact, (2) causation, and (3) redressablity."  *Nolles v. State Comm. for Reorg. of Sch. Dist.*, 524 F.3d 892, 898 (8th Cir. 2008) (internal marks omitted)).

### *1.  Injury-in-Fact*

To establish injury-in-fact, the party bringing suit must have a "legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *United States v. Hays*, 515 U.S. 737, 743 (1995) (internal marks omitted).  A plaintiff challenging a state statute must show "realistic danger of sustaining direct injury as a result of the statute's operation or enforcement."   *South Dakota Min. Ass'n v. Lawrence County*, 155 F.3d 1005, 1008 (8th Cir. 1998) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).   For example, abortion providers face concrete and imminent injury where statutes would cause the provider to lose patients. *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005) (abortion provider

14

faced injury of losing minor patients where statute required parental consent before performing abortions on minors).

Plaintiffs have shown that LB 594 creates concrete and imminent injury-in-fact.  The bill requires medical providers to conduct risk evaluations and disclosures that appear to be extraordinarily difficult, if not impossible, given the breadth and depth of the research required.  The evidence now before the Court indicates that, even if it were possible to comply with the evaluation and disclosure requirements, Plaintiffs likely would expend much time and incur significant additional expense to comply with the mandates, giving rise to an imminent economic threat.  *See Singleton v. Wulff*, 428 U.S. 106, 113 (1976) (identifying abortion provider's injury as a direct financial impact on provider's practice).

Defendants argue that Planned Parenthood cannot show injury-in-fact because LB 594 applies only to individual physicians providing abortions, not to the corporate provider.  The language of the bill is not so limited.  Section 6 of the bill permits a woman to recover damages, including costs and attorney's fees, upon proving "the intentional, knowing, or negligent failure to comply with the requirements of section 28-327[.]" Although counsel for the Defendants at the time of oral argument stated that this section was intended to create liability only on the part of the physician, a plain reading of the section appears to limit only damages for "wrongful death of the unborn child" to actions against the physician.  All other categories of damages appear to be available in actions against other defendants.[3] Accordingly, Plaintiffs have shown imminent threat of economic injury running directly from the bill's mandates, and have shown that the bill's chilling effect on medical personnel may

---

[3] The bill allows the evaluation and disclosure to be made by a physician, psychiatrist, psychologist, mental health practitioner, physician assistant, registered nurse, or social worker licensed under the Uniform Credentialing Act.  Nothing in the bill appears to prevent a plaintiff from naming such individuals, or a providers such as Planned Parenthood, as defendants.

cause them to decline to have any involvement with abortion procedures, further injuring Plaintiffs' interests.

Of equal or greater significance, Planned Parenthood has shown that, if it allows any doctor to perform an abortion without complying with the bill's mandates, Planned Parenthood may be subject to disciplinary sanctions, including but not limited to, a fine of ten thousand dollars *per violation,* and suspension or revocation of its health care facility license. Its agents and employees that are licensed by DHHS, other than physicians, also may be subject to administrative sanctions, including loss of license; civil penalties up to $20,000; and criminal prosecution; all compounding the bill's chilling effect, and resulting in injury-in-fact to Plaintiffs.

### 2. *Causation and Redressability*

Article III requires that the injury must "be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Parkhurst v. Tabor*, 569 F.3d 861, 866 (8th Cir. 2009). *Lujan*, 504 U.S. at 560-61 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)) (internal marks omitted). At a minimum, a plaintiff must show a substantial likelihood that the conduct of a defendant is the cause of its injury-in-fact. *See Utah v. Evans*, 536 U.S. 452, 464 (2002); *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992).

It is true, as the Defendants note, that several circuit courts have held that federal courts cannot enjoin public officials from enforcing a statute when the statute creates a private, civil cause of action. *See Nova Health Sys.,* 416 F.3d at 1159; *Hope Clinic v. Ryan*, 249 F.3d 603, 605 (7th Cir. 2001) (per curiam); *Okpalobi v. Foster*, 244 F.3d 405, 425-30 (5th Cir. 2001) (en banc); *Summit Med. Assoc., P.C. v. Pryor*, 180 F.3d 1326, 1341-42 (11th Cir. 1999).

Here, unlike the cases relied upon by the Defendants, Plaintiffs have demonstrated that the named Defendants are a source of injury-in-fact. Dr. Joann Schaefer, who works for Kerry Winterer, who works for Governor Heineman, holds the power to impose fines on Planned Parenthood in an amount up to $10,000 per violation, and revoke Planned Parenthood's health care facility license, if Planned Parenthood "permits" any doctor to perform an abortion without complying with the mandates of LB 594. Defendants Crystal Higgins and Brenda Bergman-Evans have the power to refer Planned Parenthood's nurses and nurse practitioners to Winterer for disciplinary action, to be prosecuted by Attorney General Bruning, which disciplinary action may result in suspension or revocation of nursing credentials, fines not to exceed $20,000, and criminal prosecution for Class III and Class II misdemeanors.[4]

In *Citizens for Equal Protection v. Bruning,* 455 F.3d 859, 863-64 (8th Cir. 2006), the Eighth Circuit concluded that the Attorney General's and Governor's broad power to enforce Nebraska's constitution and statutes was a sufficient basis to satisfy causation and redressability elements of standing, as well as Eleventh Amendment concerns, where a state statute or constitutional provision erected "a barrier making it more difficult for members of a group to obtain a benefit." *Id*. at 863. LB 594 appears to erect such a barrier, making it more difficult for the Plaintiffs to provide abortion services, and, consequently, more difficult for women to obtain abortions in Nebraska. Although, as Defendants suggest, Plaintiffs could wait to be sued in a civil action and then raise as a defense LB 594's unconstitutionality, it is more likely that any medical provider, when confronted with the mandates of LB 594, and the extensive civil liability it creates, would

---

[4] Class III misdemeanors carry penalties of imprisonment up to three months and fines up to $500; and Class II misdemeanors carry penalties of imprisonment up to six months and fines up to $1,000. Neb. Rev. Stat. § 28-106.

simply stop providing abortions.  Because very few doctors provide such services now, the

constitutionality of LB 594 would evade "ripeness" and review.  That would be contrary to

the Eighth Circuit's direction as expressed in *Citizens for Equal Protection*.

Injunctive relief restraining these Defendants from taking any action to enforce LB

594 would redress at least part of the Plaintiffs' injury-in-fact.  Accordingly, Plaintiffs have

shown both causation and redressability, as well as injury, and the Court concludes that

Plaintiffs have standing to assert their claims for injunctive relief.

### B.  Plaintiffs' Standing to Obtain Declaratory Relief

Plaintiffs brought this action pursuant to 28 U.S.C. § 2201 and 2202, and Fed. R.

Civ. P. 57 and 65, seeking declaratory and injunctive relief.   The applicable statutes

provide:

> In a case of actual controversy within its jurisdiction, . . . any court of the
> United States, upon the filing of an appropriate pleading, may declare the
> rights and other legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be sought.  Any such
> declaration shall have the force and effect of a final judgment or decree and
> shall be reviewable as such.

28 U.S.C. § 2201.

> Further necessary or proper relief based on a declaratory judgment or
> decree may be granted, after reasonable notice and hearing, against any
> adverse party whose rights have been determined by such judgment.

28 U.S.C. § 2202.

Fed. R. Civ. P. 57 provides, in relevant part: "The existence of another adequate

remedy does not preclude a declaratory judgment that is otherwise appropriate.  The court

may order a speedy hearing of a declaratory-judgment action."   Fed. R. Civ. P. 65

prescribes procedures for issuance of preliminary injunctive relief.  Rule 65(1)(a)(2)

provides that  a court may advance the trial on the merits and consolidate the trial with a

hearing on a motion for preliminary injunction.

The Supreme Court has recognized "that different considerations enter into a federal court's decision as to declaratory relief, on the one hand, and injunctive relief on the other." *Roe,* 410 U.S. at 166 (citing *Zwickler v. Koota*, 389 U.S. 241, 252-55 (1967)). The propriety of declaratory relief may be addressed independent of injunctive relief. *See Steffel v. Thompson*, 415 U.S. 469-70 (1974).   Courts have also noted that "pre-enforcement review is usually granted under the Declaratory Judgment Act when a statute, 'imposes costly, self-executing compliance burdens or if it chills protected [constitutional] activity.'" *Nat'l Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (quoting *Minnesota Citizens Concerned for Life v. Fed. Election Comm'n*, 113 F.3d 129, 132 (8th Cir. 1997)).

A district court has "'the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction.'" *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 121 (1974)(quoting *Zwickler*, 389 U.S. at 254).   "The question is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id*. at 122 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  In *Super Tire*, where the plaintiff challenged a regulation that provided a potential, future benefit to third parties, and, as a result, had an indirect negative impact on the plaintiffs, the Supreme Court found "full and complete satisfaction of the requirement of the Constitution's Art. III, § 2, and the Declaratory Judgment Act" where the challenged government policy was "fixed and definite" and "by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties."  *Id.* at 122-23.

Accordingly, the Court concludes that both Plaintiffs have standing to assert their claims for declaratory relief, independent of their claims for injunctive relief.

### C.  Ripeness and Fitness for Judicial Decision

Ripeness requires that the injury in fact be certainly impending." *National Treasury Employees Union v. United States,* 101 F.3d 1423, 1427 (D.C. Cir. 1996). Ripeness separate those matters that are premature because the injury is speculative and may never occur from those that are appropriate for the court's review. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148 (1967).

"Fitness for judicial decision means, most often, that the issue is legal rather than factual.  Sufficient hardship is usually found if the regulation imposes costly, self-executing compliance burdens or if it chills protected *First Amendment* activity." *Minnesota Citizens Concerned for Life,* 113 F.3d at 312 (emphasis in original), citing *Reno v. Catholic Soc. Servs., Inc*., 509 U.S. 43, 69-71 (1993)(O'Connor, J., concurring); *Chamber of Commerce v. FEC*, 69 F.3d 600, 603-04 (D.C. Cir. 1995).

The Plaintiffs have met their burden of demonstrating that the enforcement of LB 394 presents them with a real and imminent threat of harm, imposes "costly, self-executing compliance burdens;" and chills protected constitutional activity.

### D. Eleventh Amendment Immunity

The Defendants also contend that they are entitled to immunity from suit under the Eleventh Amendment.  The Supreme Court has held that the Eleventh Amendment "does not bar a suit against a state official to enjoin enforcement of an allegedly unconstitutional statute, provided that 'such officer [has] some connection with the enforcement of the act.'" *Id.* (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

In *Planned Parenthood v. Miller*, 63 F.3d 1452, 1467 (8th Cir. 1995), the Court upheld a district court's decision finding a South Dakota statute unconstitutional and

enjoining its enforcement.[5]  The statute allowed for private, civil remedies for violations of a parental-notice statute.  The named defendants in the action were the Governor and the Attorney General of South Dakota, in their official capacities.  It may be inferred from this decision, and the decision in *Citizens for Equal Protection v. Bruning*, that the Eighth Circuit would not find the Eleventh Amendment to be a bar to Plaintiffs' action for injunctive relief against the Defendants named in this case, even absent this Court's causation and redressability findings, above.

It is recognized that in *Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon,* 428 F.3d 1139, 1141 (8th Cir. 2005), the Eighth Circuit determined that the Eleventh Amendment did bar a suit against a state official who had no power to enforce the statute.  *Id.* at 1145.  Here, however, the Defendants do have "some connection with the enforcement of the act" and, accordingly, the Eleventh Amendment does not bar this Court from considering the pending motions.

## II.  DATAPHASE FACTORS

### A.  Likelihood of Success on the Merits

As the Eighth Circuit requires, this Court will first consider whether Plaintiffs have demonstrated a likelihood of success on the merits of their claims.

The Defendants recognize that LB 594 is unconstitutional, in part.  "Defendants acknowledge that Commerce Clause jurisprudence . . . prohibits the enforcement of §10(4) of LB 594 to conduct that occurs outside the state of Nebraska."  (Defendants' Brief, Filing No. 39 at 25).  "Despite the fact that §10(4) of LB 594 unconstitutionally extends the reach

---

[5]  The district court had issued a temporary restraining order, staying the effective date of the act, but it appears that the parties stipulated to the stay "pending final determination of the constitutional questions."  *Planned Parenthood, Sioux Falls Clinic v. Miller*, 860 F. Supp. 1409, 1411 (S.D. 1994).

of the Act to conduct that occurs outside of Nebraska, it can be severed and the remaining portions of the Act upheld." (*Id*. at 16).

This Court appreciates the Defendants' integrity and candor in acknowledging that LB 594 violates the Commerce Clause of the United States Constitution. This Court concurs with that conclusion and finds that Plaintiffs are not only "likely," but certain to prevail on their challenge to the constitutionality of LB 594, under the Commerce Clause.

The Court will turn to the Plaintiffs' likelihood of success on their liberty-and-privacy-interest, void-for-vagueness, and First Amendment claims. Because, for reasons discussed below, the Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits of those claims, and because the Defendants have conceded Plaintiffs' certainty of success on their Commerce Clause claim, the remaining claims based on Equal Protection, and privacy interests of adult and minor patients with respect to mandated disclosures, will not be addressed at this juncture.

### 1.  Due Process: Liberty and Privacy Interests

The Fourteenth Amendment to the United States Constitution provides, in part, that no State shall deprive any person of liberty without due process of law. The liberty interest protected by the Fourteenth Amendment long has been recognized to encompass a right to be free from undue governmental interference in "matters that are intensely private, such as "marriage, procreation, contraception, family relationship, and child rearing and education." *Paul v. Davis*, 424 U.S. 693, 713 (1976). This aspect of due process has, at times, been referred to as "zones of privacy" (*id*. at 712), a "right of privacy" (*id*. at 713), or simply a "right to be let alone." (*Eisenstadt v. Baird,* 405 U.S. 438 454, n.10 (1972)(quoting *Olmstead v. U.S.,* 277 U.S. 438, 478 (1928)("The makers of our Constitution . . . conferred, as against the government, the right to be let alone – the most comprehensive of rights and the most valued by civilized men.") The right was applied in the context of abortion in *Roe*

*v. Wade*,[6] and has been re-affirmed by the Supreme Court in that context over the last 37 years.

In one case in which it recognized the right of privacy, *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Supreme Court said:  "The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect.  Determination by the Legislature of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts."  *Id.* at 399.

What may constitute undue interference by a state, with respect to this liberty interest in the context of abortion, was recently articulated by the Supreme Court in *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007).  "Before [fetal] viability, a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy.'"  *Id.* at 146 (quoting *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 879 (1992)).  "It also may not impose upon this right an undue burden, which exists if a regulation's 'purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'"  *Id.* (quoting *Casey*, 505 U.S. at 878).  "On the other hand, '[r]egulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose.'"  *Id.* (quoting *Casey,* 505 U.S. at 877).

---

[6] "This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy."  *Roe*, 410 U.S. at 153.

Accordingly, the issue before this Court with respect to the Plaintiffs' liberty-and-privacy-interest Due Process challenge, is whether the Plaintiffs' are likely to demonstrate that LB 594 has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion.[7]

### a.  Purpose of LB 594

As noted above, in discussion of section 2 of the bill, the section expresses the Nebraska Legislature's concern that "the existing standard of care for preabortion screening and counseling is not always adequate to protect the health needs of women," and "[t]hat clarifying the minimum standard of care for preabortion screening and counseling in statute is a practical means of protecting the well-being of women."  The section also re-states the Legislature's earlier language to the effect that the Supreme Court of the United States over-stepped its authority when issuing its decision in  *Roe v. Wade,* and that the Nebraska Legislature intends to protect the life of unborn children whenever possible.

No such legislative concern for the health of women, or of men, has given rise to any remotely similar informed-consent statutes applicable to other medical procedures, regardless of whether such procedures are elective or non-elective, and regardless of whether such procedures pose an equal or greater threat to the physical, mental, and emotional health of the patient.  From a plain reading of the language of the bill,[8] and the

---

[7]  Because Plaintiffs provide only pre-viability abortions, there is no issue for the Court to address with respect to fetal viability.  Amended Complaint, ¶ 7.  With respect to Plaintiffs' standing to assert the rights of patients in connection with the liberty-and-privacy-interest Due Process challenge, Plaintiffs have demonstrated the requisite relationship to the patients, and the patients' lack of ability to assert their own right.  *See Singleton,* 428 U.S. at 115-16.

[8] "[A]s we have held previously, we 'look to direct and indirect evidence to determine whether a state adopted a statute with a discriminatory purpose,' which may include evidence in the form of 'statements by lawmakers.'" *Jones v. Gale*, 470 F.3d at 1269

absence of any similar statutory "protections" for the health of patients in other contexts, this Court infers that the objective underlying LB 594 is the protection of unborn human life.

"[T]he legitimate interest of the Government in protecting the life of the fetus that may become a child" is recognized in *Gonzales*, 550 U.S. at 146, as it was in *Casey*, 505 U.S. at 846. The question then becomes whether the purpose of the bill is to effect this goal by placing a substantial obstacle in the path of women seeking an abortion.

The bill places certain obstacles in the path of women seeking abortions by (1) requiring medical providers to make risk assessments and disclosures that, if the bill is read literally, would be impossible or nearly impossible to perform,[9] (2) requiring medical providers to speculate about what conduct is mandated under the bill, if it is not to be read literally, but instead given some reasonable interpretation,[10] and (3) placing physicians who

_____

(quoting *Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1065 (8th Cir.2004)).  While the legislative history of the bill is in evidence (Filing No. 40), and while other evidence of interest, such as campaign speeches or literature, may be relevant to the determination of the bill's purpose, at this stage of the proceedings the Court relies on the plain language of the bill.

   [9]  See Affidavit of Kelly Blanchard ("Blanchard Aff.") Filing No. 31-5, ¶¶ 12-27.

   [10]  For example, the definitions of "Complications associated with abortion" and "Risk Factor associated with abortion" in section 3 (2) and (11) of the bill are unclear to this Court, and to the medical professionals whose affidavits are in evidence: Affidavit of Penelope A. Dickey, Filing No. 31-2, ¶¶ 11-14; Affidavit of Paul Appelbaum, M.D., Filing No. 31-3, ¶¶ 3-5; Affidavit of Darla Eisenhauer, M.D., Filing No. 31-4, ¶¶ 5-14; Blanchard Aff. ¶¶ 7-31; Affidavit of Jill Meadows, M.D. ("Meadows Aff."), Filing No. 31-6, ¶¶ 9-38 ("[I]f reasonable limitations may be read into the Act, I do not know how to determine what they are." (*Id.*, ¶ 10).)  In further example, the peer-reviewed "International Journal of Qualitative Studies on Health and Well-Being" has been published since 2006 but only articles since 2009 can be searched using PubMed or the search engine used to find articles in the Thomson Rueters Scientific Master Journal List. Similarly, the journal "Psychology, Health & Medicine," was first published in 1996 but can only be searched for articles after 2006. (*See* Blanchard Aff. ¶¶ 13-21.)  Thus, even the broadest possible search using search logic of either index will not retrieve every responsive article for a period as short as the last fifteen years.  At this early stage of the proceedings, this Court infers that the statements of these medical professionals are credible, based upon their curriculum vitae and the logic

perform abortions in immediate jeopardy of crippling civil litigation, thereby placing women in immediate jeopardy of losing access to physicians who are willing to perform abortions.[11]

The threat of such litigation is real, and imminent.  As the Supreme Court said in *Gonzales*, "[w]hile we find no reliable data to measure the phenomenon, it seems unexceptionable to conclude some women come to regret their choice to abort the infant life they once created and sustained."  550 U.S. at 159.  The four dissenting justices in *Gonzales* considered this "antiabortion shibboleth" to be patronizing, and a "way of thinking [that] reflects ancient notions about women's place in the family and under the Constitution – ideas that have long since been discredited." (*Id*. at 183-84).  Instead, this Court accepts the premise expressed in the majority opinion as reflecting a firm grasp of the obvious: Some women who obtain abortions will come to regret that choice.  That fact is inevitable, because any major decision will lead to regret in some percentage of cases.[12]  For the

_____

of their statements.

[11] As the Honorable Judge Richard Battey observed when finding certain private, civil remedies unconstitutional in *Planned Parenthood, Sioux Falls Clinic v. Miller*, 860 F. Supp. 1420 (S.D. 1994), enjoining their enactment: "If this statutory provision is allowed to stand, there may not be any provider willing to subject himself or herself to the vagaries of the statute.  What then would be the choice remaining for those women who desire to exercise their constitutional rights consistent with *Roe* and *Casey*?"  *Id.*, at 1418.  Judge Battey noted that there was at that time only one physician in South Dakota willing to perform abortions.  *Id*.

[12] Like the Supreme Court majority in *Gonzales*, this Court has "no reliable data" to measure the phenomenon, but notes that unscientific surveys readily available on the Internet indicate that parent "regret" levels reach as high as the infamous 70 percent tallied by columnist Ann Landers in 1975 when she received 10,000 letters from readers in response to her inquiry:"Do you regret having children?"  The enactment of Nebraska's short-lived "Safe Haven Law" in July of 2008 caused parents from around the nation to stream into Nebraska to relinquish their children.  More reliable data *are* available reflecting regret levels for the decision to marry – an important choice presumably preceded by sober thought and deliberation.  The most important choices have consequences, and no matter how well-reasoned and fully deliberated, those decisions can lead to remorse. That is part of the price we pay for our freedom.  (Only Edith Piaf was without regret.  Had she been

woman who comes to regret having had an abortion, LB 594 provides her with a target to blame – a physician stripped of the usual statutory and common law defenses, and made civilly liable for the most extensive damages,[13] by way of an "informed consent" mandate that is either impossible to satisfy, or so vague that the physician (and a jury) are left to speculate about its meaning.  LB 594 also provides the remorseful woman and her lawyer with a very substantial financial incentive to initiate such litigation, whether or not she truly does regret her decision to obtain an abortion – her regret is *presumed*.  (Section 10 (1).)  Although this presumption is "rebuttable," it is difficult to conceive how any defendant could effectively rebut such as assertion.

LB 594 effectively cloaks such plaintiffs as private attorneys general, as is done in RICO[14] and civil rights actions,[15] with the apparent object of turning them into quasi-prosecutors, dedicated to eliminating the activity the Legislature has found to be objectionable.

The bill's framework, therefore, creates a profound chilling effect, compounded by (1) its purported extension of its reach to any doctor advertising abortion services in

---

sober, she, too, might have had second-thoughts.)

[13]   The plaintiff may obtain damages for pain, suffering, inconvenience, mental suffering, emotional distress, psychological trauma, loss of society or companionship, loss of consortium, injury to reputation, humiliation, wrongful death of the unborn child, and costs and attorney fees.  (Sections 6 (1), (2), (3), and 10 (2).)

[14]   Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.  "The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." *Rotella v. Wood*, 528 U.S. 549, 557 (2000).

[15]   "[I]ndividuals injured by racial discrimination act as " 'private attorney[s] general,' vindicating a policy that Congress considered of the highest priority." *Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754, 758 (1989). [T]he . . . plaintiff . . . is . . . 'the chosen instrument of Congress[.]'" *Id*. at 759 (applying Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.).

Nebraska, whether or not the doctor, patient, or any medical procedure has any other connection with the state (section 10(4)),[16] and (2) its tolling of the statute of limitations for any actions that may accrue while enforcement of the bill is enjoined by a judge or judges questioning its constitutionality (section 11).

Like the civil liability statute addressed by the Eighth Circuit in *Planned Parenthood, Sioux Falls Clinic v. Miller*, LB 594's civil liability mechanism appears to be "more than enough to chill the willingness of physicians to perform abortions, [and] an undue burden on a woman's right to choose whether to terminate her pre-viability pregnancy." 63 F.3d at 1467.

At this preliminary stage, this Court finds that Plaintiffs are likely to succeed on the merits of their Due Process liberty-and-privacy-interest claim, because the purpose of the bill appears to be the preservation of unborn human life through the creation of substantial, likely insurmountable, obstacles in the path of women seeking abortions in Nebraska.

Defendants suggest that this Court should "go beyond the literal language" of LB 594 and give it a "sensible construction" so as "to effectuate the underlying purposes of the law." (Defendants' Br., Filing No. 39, at 16.) They contend that "[d]espite its admittedly broad language, the Act can be construed to require abortion providers to inform patients of only those risk factors deemed by the abortion provider, in his or her professional judgment, to be relevant to the particular patient, in accordance with the Legislature's intention." (*Id*. at 18.) Defendants note that during floor debate, the sponsoring senator stated that "the Act 'does not impose any requirements on abortion providers that are contrary to the standard of care for screening for which it applied to other medical procedures.'" (*Id*.) The sponsor's assertion is flatly contrary to the language of LB 594,

---

[16]Acknowledged by the Defendants to be unconstitutional.

28

which provides that "Nothing in section 28-327 shall be construed as defining a standard of care for any medical procedure other than an induced abortion." (Section 11(2).)

From a plain reading of the statute, and based on the evidence now available, the only sensible construction that this Court can provide for LB 594's risk-assessment and informed-consent requirements is that the Legislature intended to place a substantial, if not insurmountable, obstacle in the path of any woman seeking an abortion in Nebraska.

### b. Effect of LB 594

For the reasons stated above, even if this Court were to presume that the passage of LB 594 was motivated in whole or part by a desire to protect the health of women, this Court finds that the Plaintiffs are likely to succeed on the merits of their Due Process liberty-and-privacy-interest claims, because the *effect* of LB 594 will be to place substantial, likely insurmountable, obstacles in the path of women seeking abortions in Nebraska.

### 2. Due Process: Vagueness

Plaintiffs argue that LB 594 is unconstitutionally vague, because it is not clear what the bill requires, "[f]or example whether there are limits on the materials that must be searched or whether providers can use their medical judgment to determine what information must be included in the patient evaluation and discussion." (Plaintiffs' Br., Filing No. 4, at 9).

The void-for-vagueness doctrine was described by the Supreme Court in *Grayned v. City of Rockford*, 408 U.S. 104 (1972):

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen,

29

> judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.  Third, but related, where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.'   Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.'

*Id*. at 108-09 (footnote citations omitted).

In *Gonzales,* the Court said: "'As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"  550 U.S. at 148-49, quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *Posters 'N' Things, Ltd. v. United States*, 551 U.S. 513, 525 (1994).

"[A] vague and broad statute lends itself to selective enforcement against unpopular causes."  *National Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 435 (1963) (finding Virginia's ban against "the improper solicitation of any legal professional business" constitutionally invalid).   Such a law "may easily become a weapon of oppression, however evenhanded its terms appear."  *Id*.  "It makes no difference whether proceedings would actually be commenced."  *Id.*  Vague, but facially neutral, literacy tests, good character tests, property qualifications, and grandfather clauses were used selectively for decades to prevent black citizens from voting.  *Northwest Austin Municipal Utility Dist. Number One v. Holder*, 129 S.Ct. 2504, 2509 (2009) (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 310 (1966)).

Plaintiffs are persuasive in their argument that sections 3 and 4 of LB 594 are vague, in that they do not give a person of ordinary intelligence a reasonable opportunity to know what is mandated so that he or she can act accordingly.  Because failure to comply with the bill's mandates can lead to fines and severe regulatory penalties, if not

criminal prosecution, the Court concludes that Plaintiffs are likely to succeed on the merits of their vagueness challenge.

### 3.  First Amendment

"In general, to address a claim that a state action violates the right not to speak, a court first determines whether the action implicates *First Amendment* protections." *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d at 733 (emphasis in original) (citing *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)).  "If it does, the court must determine whether the action is narrowly tailored to serve a compelling state interest."  *Id*. (citing *Wooley,* 430 U.S. at 716).

"In [*Casey*], the Supreme Court held that 'a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion' implicates a physician's *First Amendment* right not to speak, 'but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.'" *Id.* (emphasis in original, quoting *Casey*, 505 U.S. at 884).  "However, the Court found no violation of the physician's right not to speak, without need for further analysis of whether the requirements were narrowly tailored to serve a compelling state interest, . . . where physicians merely were required to give 'truthful, nonmisleading information' relevant to the patient's decision to have an abortion[.]" *Id.* (quoting *Casey*, 505 U.S. at 882).

Plaintiffs have presented substantial evidence that the disclosures mandated by LB 594, if applied literally, will require medical providers to give untruthful, misleading and irrelevant information to patients.[17]  Accordingly, the First Amendment rights of medical

---

[17] *See generally* Meadows Aff. ¶¶ 18-38.

31

providers are implicated by the bill's mandates, and the Plaintiffs have demonstrated a likelihood of success of the merits of their First Amendment claim.[18]

For the reasons stated in parts II.A.1., 2., and 3. of this Discussion, above, the Plaintiffs have made a threshold showing that they are likely to prevail on the merits of their liberty-and-property-interest, vagueness, and First Amendment challenges to the constitutionality of LB 594, as well as the Commerce Clause challenge, conceded by the Defendants.  Discussion of the merits of the remaining challenges to the constitutionality of LB 594 will be deferred to the time when the Court addresses the merits of the Plaintiffs' action for Declaratory Judgment.

### B.  Threat of Irreparable Harm to Plaintiffs

For the reasons discussed in parts I. A., B., and C., above, the Court concludes that Plaintiffs have demonstrated an imminent threat of irreparable harm.

### C.  Public Interest and Balance of Harms

The public has a strong, legitimate interest in the enactment and enforcement of bills passed by their duly-elected representatives, and that interest weighs heavily against the granting of any injunctive relief.

---

[18]  Following the analytical framework that appears to be suggested by the Eighth Circuit in *Rounds*, once it is determined that First Amendment rights are implicated, this Court must consider whether LB 594 is "narrowly tailored to serve a compelling state interest."  A more logical framework would be to end the inquiry once it is demonstrated that the bill requires medical providers to give untrue, misleading, or irrelevant information to patients.  Finding a First Amendment violation at that juncture appears to be consistent with language from *Casey*, referred to by the Supreme Court with approval in *Gonzales:* In *Casey* the controlling opinion held an informed-consent requirement in the abortion context was "no different from a requirement that a doctor give certain specific information about any medical procedure.'  The opinion states "the doctor-patient relation here is entitled to the same solicitude it receives in other contexts."  *Gonzales*, 550 U.S. at 163 (internal citations omitted.)

The public also has an interest in ensuring that women who contemplate abortion receive information that is accurate and not misleading, in a "reasonable framework," so that their decisions will be "well informed" (*Gonzales*, 550 U.S. at 159), and a legitimate interest in "'protecting the integrity and ethics of the medical profession,'" *Id.* at 157 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997)).  LB 594 does not promote either of these interests, and appears to undermine them both, by requiring physicians to disclose information that is misleading, inaccurate, and irrelevant.  These interests weigh in favor of granting injunctive relief.

The public also has a legitimate interest in the preservation of unborn human life. LB 594 serves that public interest, but does so by placing substantial, likely insurmountable, obstacles in the path of women seeking abortions in Nebraska.  That is not permitted by the United States Constitution, as interpreted by the United States Supreme Court, and this District Court is bound by those precedents.  The public interest in preserving the separation of powers, the supremacy of the United States Constitution, concepts of federalism, and the liberty and privacy interests of individuals in exercising responsible stewardship and personal dominion of their own bodies, all weigh heavily in favor of the granting of injunctive relief.

The public interest, and the balance of harms, both weigh in favor of granting Plaintiffs' Motion, in part, as set forth below.

## III.  SEVERABILITY

Section 2 of the bill is an expression of legislative opinion that may or may not be an accurate reflection of law and fact, but the section does not impose any duties, obligations, penalties, or liabilities.  It is severable from the bill's sections that are subject to constitutional challenge, and Plaintiffs' motion for a temporary restraining order will be denied with respect to that section.

33

Section 12 of the bill imposes certain duties on DHHS with respect to the content of its Internet web site, but does not impose any duties, obligations, penalties, or liabilities on Plaintiffs or other persons on whose behalf this action is brought.  It also is severable from the bill's sections that are subject to constitutional challenge, and Plaintiffs' motion for a temporary restraining order will be denied with respect to that section as well.

Section 17, that provides for severability of sections and parts of sections of the bill, is also not a proper subject of any constitutional challenge.  Section 18, that repeals original statutes, likely would be unobjectionable to Plaintiffs, but is intertwined with the sections that are subject to this temporary restraining order, and so will be included among the sections of the bill subject to the Court's restraining order.

## CONCLUSION

LB 594 was passed by the Nebraska Legislature, signed by the Governor, and will become effective July 15, 2010.  This Court cannot enjoin the effective date of the bill or the law itself.[19]

This Court can and will enjoin the Defendants from enforcing certain sections of the bill, for the reasons set out in this Memorandum, and will expedite the hearing on the merits of Plaintiffs' action for Declaratory Judgment and permanent injunctive relief.

IT IS ORDERED:

1. Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Filing No. 2) is denied  in part, as follows:

> With respect to Sections 2 and 12 of Legislative Bill 594, 101st Leg. Reg. Sess. (Neb. 2010), to be codified within Neb. Rev. Stat. §§ 28-325 and 28-327.01;

---

[19] While the U.S. District Court for the District of South Dakota did enjoin the effective date of a statute in *Planned Parenthood, Sioux Falls Clinic v. Miller*, which action was upheld by the Eighth Circuit, it was done with the stipulation of the Governor and Attorney General, the named defendants.  *Miller*, 860 F. Supp. At 1421.

34

With respect to Section 17 providing for severability of sections; and

With respect to Section 18, to the extent that it authorizes the repeal of original §§ 28-325 and 28-317.01;

2.     The Motion is otherwise granted, as follows:

The Defendants are restrained from taking any action to enforce the remaining sections of Legislative Bill 594, 101st Leg. Sess. (Neb. 2010), specifically amendments to Neb. Rev. Stat. §§ 28-101, 28-326, 28-327, 28-327.03, 28-327.04, 28-340, 38-2021, pending further ruling by this Court on the merits of the Plaintiffs' claim for declaratory judgment and permanent injunctive relief;

3.     Defendants will respond to the Plaintiffs' Amended Complaint on or before July 26, 2010;

4.     The Defendants' Objection (Filing No. 37) to the Plaintiff's Index of Evidence is denied, without prejudice to reassertion of objections at the hearing on the merits of the Plaintiffs' claim for declaratory and permanent injunctive relief;

5.     Counsel for the parties will confer with each other and the Court's courtroom deputy, Ed Champion (402.661.7377) to schedule the hearing on the merits; and

6.     The Motion for Leave to File Amici Curiae (Filing No. 41) by Movants Coalition on Abortion and Breast Cancer, Creighton Students for Life, and Eagle Forum Education & Legal Defense Fund, is denied.


DATED this 14th day of July, 2010.

BY THE COURT:


s/Laurie Smith Camp
United States District Judge

35